IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

RICK L. KNIGHT,

      Plaintiff,

v.

VIPIN K. SHAH, M.D.,
OFFICER WISEMAN,
OFFICER WIEDAW,

      Defendants.                               Case No. 07-cv-127-DRH

MEMORANDUM & ORDER

HERNDON, Chief Judge:

## I.  INTRODUCTION

Before the Court is a Motion for Summary Judgment and supporting memorandum (Docs. 44 & 45), filed by defendant Vipin K. Shah, M.D. ("Dr. Shah"). Plaintiff has filed an opposing Response and supporting memorandum (Docs. 52 & 53), to which Dr. Shah has replied (Doc. 56).  Plaintiff filed this **42 U.S.C. § 1983** civil rights action against Dr. Shah, along with two other Defendants, for alleged violations of his Eighth and Fourteenth Amendment right to be free from cruel and unusual punishment, namely that the three Defendants were deliberately indifferent to his serious medical needs.  Dr. Shah moves for summary judgment because he believes the evidence fails to show he acted with deliberate indifference towards

Plaintiff.  Plaintiff's mere disagreement with his course of treatment, Dr. Shah argues, does not give rise to a deliberate indifference claim.  Conversely, Plaintiff believes the evidence establishes that questions of material fact exist regarding whether the totality of the circumstances surrounding Dr. Shah's treatment of Plaintiff's condition can be considered "deliberately indifferent" in terms of a constitutional violation.  Reviewing the briefs and the evidence on the record, the Court finds summary judgment is warranted.

## II.  <u>FACTS</u>

Plaintiff Rick Knight was incarcerated with the Illinois Department of Corrections on a four-year sentence (Doc. 2 - Complaint, ¶ 11).  While incarcerated, Plaintiff was housed at the Vandalia Correctional Center ("Vandalia") in Vandalia, Illinois, starting on January 27, 2005 through April 2006 (*Id*. at ¶ 12; Doc. 45, p. 2).  Several months prior to his incarceration, Plaintiff underwent arthroscopic surgery in July 2004 to repair a torn rotator cuff in his right shoulder (Doc. 2, ¶ 10).  Dr. Shah served as the Facility Medical Director for Vandalia in 2005 (Doc. 44, Ex. B - Shah Aff., ¶ 1).  Plaintiff was first seen by Dr. Shah on January 31, 2005, during which time he informed Dr. Shah and the medical staff that he had two prior surgeries on his right shoulder to reconstruct a torn rotator cuff (*Id*. at ¶ 3; Doc. 2, ¶ 13).  Due to his shoulder problems, Plaintiff requested a pass to sleep on the lower bunk in his cell, which Dr. Shah agreed to issue (Doc. 44, Ex. B, ¶ 3; Doc. 2, ¶ 14).

While working on an assigned road crew on February 16, 2005, Plaintiff re-injured his right shoulder (Doc. 2, ¶¶ 16-17 & 20).  Plaintiff reported his injury to the on-duty nurse once he arrived back at Vandalia and the next day, February 17, 2005, he reported to Dr. Shah for a medical examination (Doc. 44, Ex. E - Plf's depo., 28:19-22; 43:7-44:9; Doc. 44, Ex. A - Plf's medical records, pp. 9).  Dr. Shah prescribed Plaintiff ibuprofen, gave him a sling and ordered an x-ray of Plaintiff's re-injured right shoulder (Doc. 44, Ex. A, p. 9; Doc. 44, Ex. B - Shah Aff., ¶ 4).  Plaintiff states that he was only given the sling and the x-ray was only ordered because Plaintiff himself requested it (Doc. 44, Ex. E, 56:21-57:10).  Additionally, Dr. Shah issued Plaintiff a no-work pass for one week (*Id.*).

The x-ray was taken on February 23, 2005 (Doc. 44, Ex. A, p. 9).  On February 24, 2005, Plaintiff saw Dr. Shah for a follow-up examination (Doc. 44, Ex. A, p. 10).  As before, Plaintiff continued to express that he was in great pain and requested to see a shoulder specialist (Doc. 44, Ex. E, 58:21-59:8).  Dr. Shah discontinued Plaintiff's work camp and issued a pass for light-duty work only, as well as continued his ibuprofen prescription (Doc. 44, Ex. B, ¶ 5).  Dr. Shah reviewed the x-ray report  on March 3, 2005 and observed that the x-ray did not reveal an abnormality, dislocation or fracture.  Therefore, he concluded Plaintiff was suffering from a shoulder sprain (*Id.* at ¶ 6; Doc. 44, Ex. A, p. 11).

Plaintiff then saw Dr. Shah on March 7, 2005, complaining that a few days earlier, while taking a shower, his shoulder popped out of position, causing more pain (Doc. 44, Ex. A, p. 12, Ex. E, 60:17-61:13).  That same day, Dr. Shah

ordered an MRI of Plaintiff's shoulder (Doc. 44, Ex. B, ¶ 7). Plaintiff's medical records indicate that on March 9, 2005, an appointment was scheduled (presumably at Dr. Shah's direction) for Plaintiff to see Dr. Gray, offsite, regarding his shoulder on March 15, 2005 (Doc. 44, Ex. A, p. 13). Dr. Gray is an orthopedic surgeon (Doc. 44, Ex. B, ¶ 9). On March 15, 2005, Plaintiff met with Dr. Gray for an initial examination. Dr. Gray recommended Plaintiff return for another evaluation after he was able to review the MRI of Plaintiff's shoulder (*Id.*; Doc. 44, Ex. C - Plaintiff's offsite medical reports, p. 1). Dr. Gray also recommended Plaintiff be prescribed ibuprofen for inflammation and Tylenol #3 for his pain (*Id.*). Plaintiff complains that although he was supposed to receive the Tylenol #3 at least every four to six hours, he received it in the pill line only twice a day (Doc. 44, Ex. E, 62:2-64:7). At the time, from the x-ray, Dr. Gray was unable to see any indication of a tear in Plaintiff's right rotator cuff (Doc. 44, Ex. C, p. 1).

The MRI report came back[1], indicating that Plaintiff did, in fact, have a tear in his right rotator cuff (Doc. 44, Ex. C, pp. 2-3). On April 7, 2005, Dr. Shah obtained the MRI report and confirmed this diagnosis (Doc. 44, Ex. B, ¶ 11). Plaintiff later went to his follow-up examination with Dr. Gray on May 6, 2005, who also confirmed Plaintiff had a tear in his right rotator cuff (Doc. 44, Ex. C, p. 4). Dr. Gray recommended Plaintiff see Dr. Lee, who is a shoulder specialist and continued his ibuprofen prescription (*Id.*). On May 26, 2005, Plaintiff met with Dr. Lee, who

---

[1] Plaintiff's medical records indicate that this was actually an arthrogram, taken on April 1, 2005 (Doc. 44, Ex. A, p. 20; Doc. 44, Ex. C, pp. 2-3).

also identified the rotator cuff tear and instructed Plaintiff to continue his physical therapy twice a week for two weeks (*Id*. at 5-6).  Dr. Lee also prescribed a different anti-inflammatory called Daypro (*Id*. at 6; Doc. 44, Ex. E, 70:4-19).  Lastly, he informed Plaintiff that if he chose to undergo a third surgery on his shoulder, there was a chance he could lose motion or have incomplete relief of pain (Doc. 44, Ex. C, p. 6).

Plaintiff's final examination with Dr. Lee occurred on June 27, 2005 (Doc. 44, Ex. A, p. 31).  During this appointment, Dr. Lee explained that because of Plaintiff's two prior shoulder surgeries, it was difficult to ensure a good prognosis if he were to undergo a third surgery (Doc. 44, Ex. C, p. 10).  However, Dr. Lee said Plaintiff, if he so elected, could chose to undergo surgery either while incarcerated or wait until he was released from prison (*Id*.).  If he chose surgery while incarcerated, Dr. Lee believed Plaintiff would not be a good candidate for any extensive reconstructive endeavors (such as tendon transfers) (*Id*.).  However, Plaintiff stated he would prefer to have Dr. Lee operate on his shoulder while he was incarcerated because of the pain he was experiencing and also because he was unsure of his health care options once released from prison (*Id*.).  Dr. Lee intended to perform arthroscopic surgery in order to try to diagnose the extent of Plaintiff's shoulder injury.  If it appeared amenable to repair, he would attempt to do so, but if it did not, he would leave the shoulder as it was and Plaintiff would need to address the injury later on, with more formal surgery (*Id*.).  Lastly, Dr. Lee prescribed Ultracet for Plaintiff's pain and they awaited approval of the proposed

arthroscopic surgery (*Id.*).  Plaintiff claims he never received any Ultracet (Doc. 44, Ex. E, 73:13-20).

Because Plaintiff was incarcerated, the request for surgery needed to be approved by the Illinois Department of Corrections ("IDOC") (Doc. 44, Ex. B, ¶ 16). Dr. Shah states that he submitted Plaintiff's request to IDOC, including the recommendation by Dr. Lee, but it was ultimately denied (*Id.*).  Dr. Shah also appealed the initial denial.  Upon review of Dr. Shah's appeal, IDOC Medical Director, Willard Elyea, M.D., determined that the denial was appropriate based on Dr. Lee's finding that "With multiple surgeries it's harder and harder to ensure good prognosis.  While he is incarcerated I do not believe he is a good candidate for any extensive reconstructive endeavors such as tendon transfers."  Instead, Dr. Elyea instructed Dr. Shah to continue to follow up with Plaintiff's condition, prescribe physical therapy and anti-inflammatory medication (Doc. 44, Ex. D - 9/12/05 letter from Dr. Elyea to Dr. Shah).  Plaintiff has since been released from incarceration but has not had any further surgeries on his right shoulder (Doc. 44, Ex. E, 78:1-2).

### III.  DISCUSSION

**A.    Legal Standard**

**1.    Summary Judgment**

Summary judgment is appropriate under the Federal Rules of Civil Procedure when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **FED. R. CIV. P. 56(c)**; *Celotex Corp. v. Catrett*, **477 U.S. 317, 322 (1986)**. The movant bears the burden of establishing the absence of factual issues and entitlement to judgment as a matter of law. *Wollin v. Gondert*, **192 F.3d 616, 621-22 (7th Cir. 1999)**. The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *Schneiker v. Fortis Ins. Co.*, **200 F.3d 1055, 1057 (7th Cir. 2000)**; *Baron v. City of Highland Park*, **195 F.3d 333, 337-38 (7th Cir. 1999)**. In response to a motion for summary judgment, the nonmovant may not simply rest on the allegations as stated in the pleadings. Rather, the nonmovant must show through specific evidence that an issue of fact remains on matters for which the nonmovant bears the burden of proof at trial. *Walker v. Shansky*, **28 F.3d 666, 670-71 (7th Cir. 1994)**, *aff'd*, **51 F.3d 276 (citing** *Celotex*, **477 U.S. at 324)**.

No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 249-50 (1986) (citations omitted);** *accord Starzenski v. City of Elkhart*, **87 F.3d 872, 880 (7th Cir. 1996);** *Tolle v. Carroll Touch, Inc.*, **23 F.3d 174, 178 (7th Cir. 1994)**. "[P]laintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment." *Weeks v. Samsung Heavy Industries Co., Ltd.*, **126 F.3d**

**926, 939 (7th Cir. 1997)**.  In other words, summary judgment may not be averted merely by the non-moving party "baldly contesting his adversary's factual allegations," but instead, the Plaintiff must come forth with probative evidence to substantiate the allegations of the complaint.  ***Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997) (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))**.

  **2. Deliberate Indifference to a Serious Medical Need**

   In ***Estelle v. Gamble,* 429 U.S. 97 (1976)**, the Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, imposes a duty upon states to provide adequate medical care to incarcerated individuals.  ***See id.* at 103; *see also Walker v. Benjamin*, 293 F.3d 1030, 1036-37 (7th Cir. 2002)**.  To create a violation by failing to provide medical care, there must be "deliberate indifference" to a substantial risk of harm.  ***Sherrod v. Lingle,* 223 F.3d 605, 610 (7th Cir. 2000) (citing *Farmer v. Brennan,* 511 U.S. 825, 837 (1994))**.  This standard erects two high hurdles which every inmate-plaintiff must clear.  ***Dunigan v. Winnebago County,* 165 F.3d 587, 590 (7th Cir. 1999)**.  The plaintiff must show: 1) the medical condition was objectively serious; and 2) the state officials acted with deliberate indifference to his medical needs, which is a subjective standard.  ***Sherrod,* 223 F.3d at 610**.

A condition is objectively serious if "failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain." ***Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)**. To show deliberate indifference, a plaintiff must establish that the jail official "was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed" to his health. ***Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002) (citing *Wynn v. Southward*, 251 F.3d 588 (7th Cir. 2001))**. The Seventh Circuit has said that deliberate indifference requires a showing of more than mere negligence (or even gross negligence) but less than purposeful infliction of harm. ***Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 926 -927 (7th Cir. 2004) (citing *Matos* ex rel. *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003); *Perkins*, 312 F.3d at 875**. Furthermore, an inmate is not entitled to demand specific care, nor is he entitled to the best care available. ***Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997)**.

In other words, "the Eighth Amendment is not a vehicle for bringing claims for medical malpractice." ***Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996) (citing *Estelle*, 429 U.S. at 105; *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996))**. Nor is it a vehicle to determine "whether one course of treatment is preferable to another . . . [as] [s]uch matters are questions of tort, not constitutional law." ***Id.* at 591**. As the United States Supreme Court declared, "[A]n official's failure to alleviate a significant risk that he should have perceived but did

not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan*, **511 U.S. 825, 838 (1994)**.

**B.      Analysis**

Dr. Shah asserts that he is entitled to summary judgment because Plaintiff fails to show an existing question of material fact regarding whether he treated Plaintiff with deliberate indifference.  In other words, Dr. Shah believes there to be "no evidence [that he] personally knew of a serious risk and consciously disregarded it" (Doc. 45, p. 2).

**1.      Serious Medical Need**

In his summary judgment motion, Dr. Shah does not appear to contest that Plaintiff's shoulder condition constituted a "serious medical need."  Instead, he solely argues there is no showing that he acted with deliberate indifference, and so the Court's analysis will focus on this issue.

**2.      Deliberate Indifference**

Dr. Shah asserts that the evidence does not present a question of material fact that he was deliberately indifferent to Plaintiff's serious medical needs – in particular, Plaintiff's right shoulder.  Rather, Dr. Shah believes that the evidence more appropriately indicates Plaintiff's simple disagreement with the treatment rendered, which does not amount to a constitutional violation.  Dr. Shah further asserts that Plaintiff received continuous medical attention to diagnose and then treat his condition.  He also disputes Plaintiff's allegations that he verbally abused Plaintiff

at any time or lost Plaintiff's prescriptions written by offsite physicians. At best, Dr. Shah claims that the evidence may signify a delay in Plaintiff's treatment, for which Plaintiff has not met the requisite evidentiary burden to survive summary judgment.

In contrast, Plaintiff argues that Dr. Shah's deliberate indifference can be shown by the following two general categories: (1) Dr. Shah's failure to order Plaintiff off work detail when he previously knew of Plaintiff's medical condition regarding his right shoulder; and (2) Dr. Shah's delay in rendering medical treatment to Plaintiff, his delay in referring Plaintiff to see outside specialists, his refusal to diagnose, treat and/or medicate Plaintiff at times, his refusal to follow prescribed medication and physical therapy regimens for Plaintiff from offsite physicians and his verbal abuse of Plaintiff. Plaintiff believes the evidence presents enough questions of material fact regarding Dr. Shah's behavior towards and treatment of Plaintiff (or refusal to treat) to survive summary judgment. The Court will address each of these general categories in turn.

### a. Failure to Place on Work Restriction

As previously stated, Plaintiff argues that the first distinct matter in which Dr. Shah exhibited deliberate indifference towards Plaintiff's serious medical needs was by failing to place Plaintiff on work restriction when he arrived at Vandalia, despite the fact that he had told Dr. Shah about his right shoulder problems during his initial physical examination. Recalling the facts, Plaintiff arrived at Vandalia at the end of January 2005 and was examined by Dr. Shah several days later. He informed Dr. Shah that he had two previous surgeries on his right

shoulder and was still having problems with it. Approximately a week later, Plaintiff was assigned to the work camp section of Vandalia and about a week after that, he was placed on a road crew work assignment. During that assignment, he re-injured his right shoulder. Plaintiff believes Dr. Shah, knowing Plaintiff had problems with his right shoulder, should have placed him on work restriction to prevent him from being assigned to the work camp.

Although Plaintiff argues that Dr. Shah failed to follow protocol, the record offers nothing in the way of correctional facility protocol regarding which correctional facility officials are responsible for determining inmate work restrictions and work assignments. Therefore, there is nothing to indicate that it was Dr. Shah's responsibility as Vandalia's medical director to place inmates on work restriction when needed. Similarly, there is no evidence on the record to establish that Dr. Shah had knowledge that Plaintiff was going to be assigned to the work camp. Plaintiff never requested that Dr. Shah place him on work restriction. He did, however, during his initial examination with Dr. Shah, request issuance of a pass to sleep on the bottom bunk, explaining that it was too painful for him to hoist himself onto the top bunk to sleep. Upon request, Dr. Shah issued this bottom bunk pass. The same may have held true for a work restriction, yet Plaintiff never made such a request to Dr. Shah.

Additionally, Plaintiff's deposition testimony shows that before he re-injured his shoulder, he did not mind his work camp assignment, stating:

I did not put in for sick call because I was told to go to work or go to the

hole, so I did, and it wasn't that bad with me pulling the small brush and that. If I could have got by with that, I enjoyed it, because I got to leave the prison. I got to get away from that place. And the more time away from there, the more easier it was for me. But until the day of my injury, I did not hurt.

(Doc. 44, Ex. E - Plf's depo., 31:13-22.)

The Court also finds the cases Plaintiff cites in support of his argument to be distinguishable. These cited cases found deliberate indifference where a prison official assigned an inmate to certain confinement conditions or work details which the official knew would endanger the inmate's life or cause undue pain.[2] In this case, however, Dr. Shah did not knowingly assign Plaintiff to work detail. In fact, there is nothing on the record to show that he knew Plaintiff would be assigned to the work camp at all or that he himself made the assignment. While the Court is not implying that it was Plaintiff's duty alone to ensure he was issued a work restriction pass, the evidence certainly does not raise a question of material fact that Dr. Shah acted with deliberate indifference absent any evidence to show it was his responsibility to place Plaintiff on work restriction, that it was requested of him or that he was the one who knowingly assigned Plaintiff to the work camp.

**b.    Delay in Plaintiff's Treatment**

Once he had re-injured his right shoulder while on the work crew, Plaintiff argues that Dr. Shah acted with deliberate indifference to his medical

---

[2] Plaintiff cites the following cases in support: ***Helling v. McKinney*, 509 U.S. 25 (1993); *Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989); *Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir. 1977); *Lucko v. Nolen*, 2008 U.S. Dist. LEXIS 39206 (E.D. Tex. May 13, 2008); *Grady v. Edmonds*, 2007 U.S. Dist. LEXIS 78009, 15-16 (D. Colo. June 11, 2007)**.

condition by refusing to timely diagnose his injury and refer him for proper treatment. Unlike Dr. Shah suggests, Plaintiff argues that the situation amounts to more than just a simple "disagreement" with the treatment rendered.

Plaintiff first complains that Dr. Shah did not examine him until the day after he re-injured his shoulder. However, Plaintiff's medical records indicate that Plaintiff was seen by a nurse on the day of his re-injury. The Court does not find that seeing the doctor the following day, on February 17, 2005, constitutes deliberate indifference either via delay in treatment or refusal to treat. In fact, this response seems rather timely, even had Plaintiff not been incarcerated at the time. Plaintiff also asserts that during this examination, Dr. Shah refused his request to order an x-ray of Plaintiff's right shoulder and only prescribed Ibuprofen after Plaintiff requested it. Plaintiff's medical records, on the other hand, show that on February 17, 2005, an x-ray was ordered and taken several days afterward, on February 23, 2005. The records also show that Plaintiff also received an ibuprofen prescription, as well as a no-work pass for a week and an arm sling (Doc. 44, Ex. A - Plf's med records, p. 9).[3] Therefore, unlike Plaintiff suggests in his brief, the x-ray was not refused and even if he had to request Ibuprofen, it was thereafter prescribed. This does not signify deliberate indifference. As patients, each of us have to act as own advocate while being treated by a physician – Plaintiff is no different.

---

[3] Plaintiff's February 17, 2005 grievance that he was not receiving proper medical treatment, shows that it was ultimately denied by the Chief Administrative Grievance Officer because Plaintiff's medical records indicated an x-ray was ordered by the medical doctor, as well as a sling and Motrin, as well as work restrictions implemented (Doc. 53, Ex. 1, pp. 1 & 23).

Dr. Shah ordered a follow-up examination a week later, on February 24, 2005. During this examination, Plaintiff argues that Dr. Shah refused to send him to see a specialist and even though Plaintiff was in a lot of pain, all the doctor did was to yell at him. Yet, as the medical records show, Dr. Shah was waiting on the x-ray report to make an assessment of Plaintiff's physical condition in order to further treat him. Dr. Shah did not see the x-ray report until March 3, 2005 (Doc. 44, Ex. B - Shah Aff., ¶ 6). Therefore, during the February 24, 2005 examination, all Dr. Shah did was to temporarily conclude Plaintiff was suffering from a shoulder sprain, continue his Ibuprofen and discharge him from work camp, issuing him a pass for light duty work only (Doc. 44, Ex. A, p. 10). Even entertaining Plaintiff's argument that Dr. Shah should have realized that given Plaintiff's past shoulder surgeries, he was suffering from more than merely a shoulder sprain and acted more promptly to refer him to a specialist, it amounts to a medical opinion and does not rise to the level of deliberate indifference.

Because the x-ray report did not indicate an abnormality, dislocation or fracture, Dr. Shah maintained his diagnosis that Plaintiff had sprained his right shoulder (Doc. 44, Ex. A, p. 11). Dr. Shah continued Plaintiff's Ibuprofen and recommended a follow-up examination in one week (*Id.*). The next day, Plaintiff reported to a nurse that while he was taking a shower, he raised his arm up to wash his hair and his shoulder popped out of position, hurting him worse than before (Doc. 44, Ex. A, p. 12; Ex. E, 60:17-61:1). Plaintiff saw Dr. Shah on March 7, 2005. During this appointment, Dr. Shah ordered an MRI of Plaintiff's right shoulder,

continued his light duty pass and continued his prescription for Ibuprofen (Doc. 44, Ex. A, p. 12; Ex. B, ¶ 7; Ex. E, 61:3-13). There is also a note in Plaintiff's medical records, dated March 9, 2005, stating that Plaintiff had an appointment to see offsite specialist, Dr. Gray, about his right shoulder (Doc. 44, Ex. A, p. 13). Dr. Shah also saw Plaintiff again on March 10, 2005, where he again continued the Ibuprofen prescription (*Id.*).

Again, Plaintiff complains that he received "no treatment" from Dr. Shah from around the time he re-injured his right shoulder on February 16, 2005, until the time he saw Dr. Gray on March 15, 2005 (Doc. 53, p. 14). Being yelled at was the only response Plaintiff believes he received from Dr. Shah during that time. The record before the Court, on the other hand, shows that Dr. Shah continued to treat Plaintiff during that month. Dr. Shah initially placed Plaintiff on bed rest and then issued a pass for light duty work only, discontinuing his work camp assignment. It appears he prescribed Plaintiff Ibuprofen throughout, as well as fitted Plaintiff with an arm sling and ordered both an x-ray and MRI.[4] From the x-ray report, because there was no indication of a fracture or other abnormality in Plaintiff's right shoulder, Dr. Shah diagnosed a shoulder sprain and continued to follow-up with Plaintiff for treatment. Once Plaintiff complained of increased pain, Dr. Shah ordered the MRI and referred Plaintiff to Dr. Gray, an offsite specialist.

This all occurred within a month after Plaintiff's injury. The Court does

---

[4] From Plaintiff's deposition testimony, he states that the MRI could not be taken because of the screws in Plaintiff's right shoulder (Doc. 44, Ex. E, 59:23-60:10).

not find this an actionable delay in treatment or refusal to treat. Again, Dr. Shah was acting based on his diagnosis from the x-ray. Further, when Plaintiff complained of continued pain that seemed to indicate something possibly more severe than a mere sprain, Dr. Shah acted accordingly, referring Plaintiff to Dr. Gray for further evaluation. He continued to treat the inflammation of Plaintiff's shoulder with Ibuprofen. Although Plaintiff may have wanted stronger pain medication, Dr. Shah was often limited in what he could prescribe, as it had to come from a list of medications approved by the medical vendor (Doc. 45, p. 4).

Even had it been undisputed that Plaintiff needed to see a shoulder specialist from the beginning (which the Court finds it was not), a month's time until he gets an appointment with this specialist does not constitute deliberate indifference on Dr. Shah's part. In fact, this delay is fairly typical, considering the busy schedule physicians maintain– often one cannot get in to see a specialist for a month or longer. To claim that a delay in medical treatment rises to the level of a constitutional violation as Plaintiff does, he must introduce verifying medical evidence into the record to establish the detrimental effect of the delay. *See Walker v. Benjamin*, **293 F.3d 1030, 1038 (7th Cir. 2002);** *Langston v. Peters*, **100 F.3d 1235, 1240 (7th Cir. 1996)**. Plaintiff has not introduced the necessary medical evidence to show that any delay in his treatment caused a detrimental effect. Additionally, Plaintiff's complaints of verbal abuse, without more, do not rise to the level of a constitutional violation. If true, it does constitute bad beside manner on Dr. Shah's part, but again,

this is not enough to base a finding of deliberate indifference when adequate treatment has been rendered.

After examining Plaintiff, Dr. Gray recommended a follow-up once he had the opportunity to evaluate Plaintiff's MRI slides. He also continued to prescribe Ibuprofen for inflammation and Tylenol #3 for the pain (Doc. 44, Ex. C, p. 1; Ex. A, p. 17). Plaintiff believes Dr. Shah was deliberately indifferent in that he refused to carry out Dr. Gray's prescription as written. Dr. Gray prescribed Tylenol #3 every four to six hours for seven days and Plaintiff states that he only received them twice a day for five days. Yet, nothing in the record leaves a question of fact regarding Dr. Shah's alleged behavior. Instead, Plaintiff's deposition testimony reveals that it was not Dr. Shah who limited Plaintiff's receipt of Tylenol #3, but the correctional officers. Administering medications at Vandalia occurred in the "pill line," as Plaintiff described:

> A: [Y]ou go on the pill line, which is one in the morning and one in the evening. And, well, they didn't want me – they didn't want to have to let me go over there when I was in pain in the middle of the night, get a guard to come get me, and so you got a pill in the morning and you got a pill at night.
>
> Q: And when you say they didn't want you going in the middle of the night, who is "they"?
>
> A: I guess the officers, you know, I guess.

(Doc. 44, Ex. E, 64:18-65:4.)

Plaintiff, therefore, has not introduced any evidence that it was Dr. Shah who prevented him from receiving his Tylenol #3's as prescribed by Dr. Gray.

Instead, it appears to be a function of the dispensing procedures at Vandalia. However, Plaintiff does state that he complained about this to Dr. Shah, but again, the only thing Dr. Shah did was to yell at him, calling him a drug addict and an alcoholic (Doc. 44, Ex. E, 65:5-66:8). Again, even though the Court does not condone Dr. Shah's alleged behavior towards Plaintiff, this alone cannot constitute deliberate indifference. Plaintiff also states that Dr. Shah would often refuse to see him, but the records indicate Plaintiff continued to see Dr. Shah on a regular basis. It is difficult to fathom that Plaintiff would have the ability to see Dr. Shah upon his every demand. If that luxury were available, there would be no need to schedule appointments with doctors.

To further his argument of deliberate indifference, Plaintiff claims that Dr. Shah left him unmedicated "for more than a month" and ignored the orders from outside specialists, such as Dr. Gray (Doc. 53, p. 15). Once again, however, Plaintiff's medical records show that he was continually prescribed Ibuprofen or other pain medication from the time of his re-injury. It is clear Plaintiff believes he should have received medication other than what he was prescribed, but he makes an insufficient showing of why. This contention boils down to a mere disagreement with treatment, something that also does not rise to the level of a constitutional violation.

Also, Plaintiff complains that Dr. Shah would "lose" his prescriptions written by off-site specialists and that he discontinued Plaintiff's physical therapy (Doc. 44, Ex. E, 62:9-63:15; 66:10-16). Plaintiff claims that Dr. Gray ordered

Plaintiff undergo physical therapy, but from the Court's review, neither Dr. Gray's reports nor Plaintiff's medical records indicate a recommendation of physical therapy until his first appointment with Dr. Lee on May 26, 2005 (Doc. 44, Ex. C, pp. 1-6). Dr. Lee recommended Plaintiff undergo physical therapy twice a week for two weeks (*Id.* at p. 6), which Plaintiff's medical records indicate he was scheduled to attend (Doc. 44, Ex. A, p. 28; *see also* p. 33 and Ex. C, pp. 7-9). Thus, Plaintiff offers nothing on the record besides his own self-serving testimony to indicate that Dr Shah wrongfully discontinued his physical therapy.

Furthermore, because Plaintiff fails to specify which prescriptions came up "missing" or "lost," there is no way for the Court to verify his allegation with evidence on the record. What the record does show is that Dr. Gray prescribed Ibuprofen and Tylenol #3 – both of which were filled (albeit there is a discrepancy about how long Plaintiff received Tylenol #3, but the Court could not find this directly attributable to Dr. Shah). Plaintiff has never complained that he was prevented from taking Ibuprofen (normally, taken as "Motrin"). Dr. Lee recommended a different anti-inflammatory. Plaintiff was put on DayPro, but this caused an allergic reaction, so it was discontinued for obvious reasons; Plaintiff continued taking Tylenol #3 for the pain (Doc. 44, Ex. A, p. 27). Dr. Shah later prescribed Ultracet for Plaintiff's pain, which Dr. Lee acknowledged (Doc. 44, Ex. A, p. 37; Ex. C, p. 10). Additionally, Plaintiff fails to present any records of prescriptions ordered by the physical therapist to substantiate his allegations that these were "lost" by Dr. Shah. In fact, the one grievance addressing Plaintiff's

difficulty obtaining his medications, dated June 29, 2005, was reviewed by the Chief Administrative Grievance Officer, who found that Plaintiff was receiving Tylenol #3 for his pain and seemed satisfied with the results (Doc. 53, Ex. 1, pp. 11-12 & 18). In sum, regardless of Plaintiff's allegations of lost prescriptions, the record does not show an existing question of material fact in this regard to survive summary judgment.

Eventually, it was determined that Plaintiff had a torn rotator cuff in his right shoulder. He was later referred to Dr. Lee, a shoulder specialist, for an examination. Dr. Lee recommended several treatment options Plaintiff could pursue, one of them being to have arthroscopic surgery on his right shoulder while he was incarcerated at Vandalia. As previously recounted in the facts section of this Order, IDOC ultimately denied Plaintiff's request for surgery, based upon the finding by Dr. Lee that surgery at this stage could not ensure a good prognosis, nor was Plaintiff a good candidate while incarcerated (*see* Doc. 44, Ex. D, p. 1). Plaintiff cannot attribute this denial of treatment (surgery) to Dr. Shah, as he was not the party responsible. In fact, the record shows Dr. Shah appealed IDOC's denial, which was affirmed by the Agency Medical Director, Willard Elyea, M.D. (*Id.*).

Upon being informed that Dr. Shah was not the one who denied Plaintiff's request for shoulder surgery but instead had appealed the denial, Plaintiff stated he still felt that "Dr. Shah is not a very good doctor at all" (Doc. 44, Ex. E, 77:16). Plaintiff believes that the "totality of the allegations" show Dr. Shah's deliberate indifference, even if each instance, taken separately, can be construed as

nothing more than negligence. Dr. Shah's name calling and other verbal abuse, Plaintiff argues, provides insight into Dr. Shah's motivations and attitude that eventually led to his refusal to treat Plaintiff's condition.

While the Court is certainly sympathetic with the fact that Plaintiff has not been able to rehabilitate his shoulder or lessen the undoubted severe pain he still experiences in his right shoulder, the Court simply does not view the facts in alignment with Plaintiff's version of events. In sum, the Court finds no question of material fact exists as to whether Dr. Shah acted with deliberate indifference towards Plaintiff's serious medical needs. On the contrary, the Court finds the facts on record establish that Plaintiff received reasonably adequate and continuous treatment for his right shoulder injury. Any denial of treatment cannot be attributable to Dr. Shah via the evidence on the record. That Plaintiff may be unsatisfied with the overall treatment he received does not give rise to civil rights claim for violation of his Eight and Fourteenth Amendment rights. ***See Garvin v. Armstrong*, 236 F.3d 896, 897 (7th Cir. 2001) (" [A] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation.")**. Dr. Shah may not have been the kindliest physician, yet the standard of care he rendered unto Plaintiff does not constitute deliberate indifference and so, summary judgment must be granted in the doctor's favor.

## IV.  <u>CONCLUSION</u>

For the reasons as discussed herein, defendant Vipin K. Shah, M.D.'s Motion for Summary Judgment (Doc. 44) is hereby **GRANTED**.  Summary judgment shall enter in favor of Dr. Shah and against Plaintiff on all Counts of Plaintiff's Complaint against him.

**IT IS SO ORDERED**.

Signed this 26th day of January , 2009.

/s/      *David R Herndon*

**Chief Judge**
**United States District Court**